Morning, your honors and may it please the court. My name is Leslie Griffith, and I represent plaintiff appellant National Audubon Society. We're before this court today because the Army Corps of Engineers unlawfully issued a permit to build a terminal groin to artificially harden the shoreline on Ocean Isle. This thousand foot long rock jetty sticking out from the beach would block the natural flow of sand along the shore, dramatically eroding the last undeveloped beach on the island at a cost of millions of dollars of federal and local taxpayer money. But as one federal agency said, this terminal groin would destroy the ecological functioning of the area. At every step in this permitting process, the Corps exaggerated economic costs and minimized environmental harms, favoring the terminal groin. The agency chose to rely on a flawed model, and then tried to have it both ways, using and rejecting results depending on whether they favor the terminal groin. The court cut short its analysis looking to just a few years of project, and the agency ignored the overwhelming evidence from expert agencies that the project would destroy the area at the east end of the island. These arbitrary decisions skewed the analysis to favor the terminal groin. The National Environmental Policy Act, or NEPA, demands that the Corps thoroughly study the consequences of a project like the terminal groin, and fairly compare it to other alternatives. That's so the Corps can make an informed decision, but it's also so the public understands the consequences of those decisions, and can weigh in. The Clean Water Act that imposes guardrails on the Corps decision requires that they only permit a project if no other project would achieve the same goal at less environmental cost. And underlying both these obligations is the Administrative Procedure Act, making sure that agencies carry out their responsibilities rationally, instead of arbitrarily. The Corps failed on all three fronts. I'm happy to answer questions on any of the issues in our brief, but today I want to focus on three points. First, the Corps measured environmental harms from erosion in one way, and economic costs from erosion another way. But the Corps cannot have... You know, you're free to argue that, but the agency gave a fairly rational explanation for why it did that. The economic costs were over a 30-year period. It showed, and you see the drawings, it showed at that corner at the east end, the erosion was actually getting up near the houses, near the road, and they took a 30-year period to compute the economic costs. When it came time to evaluating the environmental harm, they used a period gauged by the refurbishing plans that were done, and they could not project beyond them because of the actual real-life situations, but they gave an assessment as to what was going to happen, and what you're basically doing is trying to compare apples and oranges, and they can't be compared. They have to have different analyses, and that was their explanation. They spent some time on giving that explanation, and it seemed quite rational. It seemed to me your standard is to show that what they did in relying on that was irrational, and you suggest it was manipulative, and they basically say that was dictated by the context, circumstances, and the cycling of the refurbishing of the beach under the federal project. Your Honor, there are two different issues of inconsistency here, and I think you've brought up both of them, and I'm happy to respond to both of them. The first would be the timeframe that they measured, and the second is the numbers that they used, and so first on the timeframe. Well, the numbers is a different issue. We can go into that, too. I mean, the 408,000 cubic yards as compared to what they last refurbishing was, and there are some explanations for that, too, and that may be the most imperfect part of their analysis, I think, but I think your whole argument with respect to a 30 year analysis for the economic impact and the five year analysis for the environmental is totally justified by all the data they have, the circumstances in real life, and nobody's mentioned the fact that all the refurbishings, the recent refurbishings were in a period of time when there were some huge hurricanes hitting that coast, but that's not really, was not relied on. They took an average of 13 years for that sand, but my whole point is, it seems to me if you're going to address and attack the agency to conclude it was capricious, you're going to have to examine what they gave as their reasons for doing it, not that they were, in your point, sort of manipulative and dishonest. They were trying to make a selection between five different proposals, and they gave a reason why each one would be good or bad, and they selected the fifth. You have to come now and say that was unreasonable, because we're not scientists. We're basically assessing whether they conducted the necessary investigation and made a rational decision, and so that's your task in proving it, and I'm happy to hear it all, but I can say the comparison between environmental analyses using a different time period than the economic almost doesn't make sense to me the way you argue it. Theirs makes complete sense. I think your argument about the 408,000 cubic yards is a good argument. And the question is, is that enough to say, number four, I think your your choice is number four, right? Option four. Your Honor, there's, there's not the question here is not sort of what what the ideal choice is. The question is, is the terminal groin permissible? And we are saying that that was not the least environmentally damaging alternative that could that could choose those goals. They don't have to get the they have to conduct, they have to weigh all the factors, don't they? They have to look at everything that's happening. The court, the court does have to look at everything that's happening. And that's something where we think that and so does the agency. Yeah. Absolutely. And, you know, when it comes to the timeframe, I think the explanation given by the agency is irrational, because you can't depend on sort of wiping the slate clean every two to five years with refurbishment, because in the area that is most vulnerable, they didn't wipe, they didn't ever wipe the slate clean. What they did is they say the data change and for each five years and they have a different group of data. And therefore, they cannot project data in the first five years into the second five years, they have to conduct a new analysis based on other factors that come in and change it. But they're still looking at the same deal, as I understand it. And I understand your position is that the beach down at the east end was clearly eroding badly, I've seen some pictures of it, it was getting up to the near the streets and the houses. And the idea was to try to get sand and the beach there restored. And the idea was this jetty, this groin would pile up the sand on the west side of the jetty. But that naturally causes a vacuum on the east side so that the beach erodes more on the east side. But that's only for a fairly short period. And then it turns the corner, and the beach remains real wide. And of course, right across the inlet, the whole area is part of the environmental area too, and that's unaffected. And you are the area that wouldn't receive beach nourishment under any of these plans is the area that is undeveloped. It's the very east end. And so it's the east end right near the jetty, not all the way up. The farthest end of the island to the east of the right at the inlet, and that area will receive no nourishment. So to measure three to five to justify looking at two to five years of impacts based on cycles of nourishment that only happen on the developed areas of the beach doesn't make sense when the relevant environmental impact is to that far end that doesn't receive nourishment. And the other question is what numbers are used, and are you comparing apples to apples or apples to oranges here? And in this case, the impact is really the same set of facts. It's erosion. And what does erosion do to habitat in the area, and what does erosion do in terms of human development, property loss and requirements for beach nourishment? When you look at the cost of any of these alternatives, it's mainly the millions of dollars of beach nourishment would be required. And so in measuring those, it's important for the Corps to understand for itself and also to explain to the public and disclose to the public, it's important for the Corps to disclose those numbers on a fair footing within each alternative. And instead, the Corps took the raw model outputs for the purposes of measuring environmental harms from erosion, but rejected those same numbers and use different much higher numbers four times as high numbers when it came to measuring the economic costs. Yeah, but when it measured the four, five alternatives, it did them on a consistent basis. In other words, the environmental assessments for the five alternatives were measured similarly and compared similarly. And the five years for the economic costs were measured similarly. What was not measured similarly is the economic costs were 30 year assessments and economic environmental were five year. But they explained that as I pointed out, and you haven't, in my judgment, pointed out that that was an irrational conclusion. As they said, it's almost the only way you could have done. The, the economic costs and the environmental costs have to be considered in relationship to each other. I think when the public is evaluating these options, they want to know what the shoreline is going to look like. And they want to know that for the purposes of knowing if they're going to be able to walk on the beach or be underwater if they're standing in the same place and what houses are going to be destroyed, if any, versus what the impact of the peaceful undeveloped areas where they where they recreate are. And if those aren't compared in the same way, it's impossible for the public to evaluate any alternative. In this situation, if you only looked at the environmental impact section of, of the environmental impact statement here, you would see pretty minimal erosion estimates no matter what you did. And that includes the baseline alternative, alternative one, which is maintaining the status quo. And under that situation, you say may say that the terminal groin would not drastically erode the east end of the beach, the undeveloped area, but you also wouldn't have any need for the terminal groin, because the erosion numbers are so modest and so controllable that, you know, just a modest amount of beach nourishment would account for that. But if you looked then at the economic impact analysis, the cost analysis, and the cost comparison, the numbers used are four times as high. And so in that situation, you know, if you're trying to compare alternative five to alternative one, well, alternative five, then shows dramatic instances of property loss. Or if you're trying to compare to the alternative three, which is just trying to make up for all the erosion, with larger numbers of beach nourishment and additional beach nourishment over and above what's already being done. Well, it's immensely expensive. It's 10s of millions of dollars more expensive. And so when I as a member of the public, or as someone in the poor making decisions, is comparing these, it actually isn't fair between alternatives, because I want to know what am I, what am I getting for an a certain amount of costs imposed in terms of environmental benefit, if two things cost more or less the same amount, and one is drastically more harmful, then I'm going to look at it differently than if two things cost more or less the same, and have, you know, incrementally different differences. And here when we are talking especially between alternative four of channel realignment and alternative five of the terminal groin, the cost differences are relatively minor. Compared to some of the cost differences between the other two, those are the ones that are closest in cost. And so the scaling up of economic costs made a huge difference there. Because they were four times, the numbers were four times as high as those used for the environmental impacts. So to say that it's fine to use one set of numbers, as long as you use them consistently across the environmental harms, and another set of numbers, as long as you use them consistently across the economic harms. And this is the point that people are looking at an overall bundle of impacts for each alternative. And when those components of that bundle, the economic impacts and the environmental impacts are not on the same scale, and they're on the same scale, they're not allowing people to make a fair and rigorous evaluation and comparison of the alternatives. And so it doesn't work for the core to make their decision and base their decision on that. And it also doesn't work for the public to be able to understand what's going on here. And I think the idea that the core is sort of using the model for only relative purposes and relative comparisons, if that had been what was done, we might be in a different place here. But instead, when it came to economic impacts, and economic impacts alone, the core decided that some measure of, you know, by their estimate, a more realistic absolute magnitude was important to convey to the public. But they didn't do so for environmental harms. And so we have these drastically different numbers. And so when the numbers that you are showing and the amount of erosion you're showing... I mean, abstracting a little bit away from the specifics here, I mean, this comparison often in these types of cases seems very difficult to make, right? You're comparing environmental harms that are often somewhat difficult to quantify with economic harms, which though difficult or somewhat easier to quantify, but they're fundamentally sort of look a lot like apples and oranges. And those make for very difficult choices in these NEPA governed cases. How do we, how do we understand that? I mean, you're telling us that we ought to treat, you know, and analyze them the same. But intuitively, that doesn't, that doesn't make sense. And I understand the coarse argument to basically line up with that. Help me understand why I ought to think of those two things that intuitively feel very different as the same. Yes, Judge Richardson, I think we have a somewhat unusual situation in the context of this project, where we are, in fact, considering the same impact in two different ways. And that's erosion, it's how much sand is lost. And so it is in a situation where we are looking at one thing in degrees and one thing in inches, it's not, you know, it should be the same comparison. And when you do that, ultimately, they're trying to project what the shoreline is going to look like under any alternative. And instead of saying, you know, the shoreline is going to be here, it's going to be this line, and you're going to lose this much sand. And that means each nourishment will cost X dollars and, and, you know, this much habitat will be lost. They're using two different shorelines for different purposes. And when you do that, it's not looking at it's, it's looking at apples and apples and calling one of them oranges. It undermines the transparency that NEPA was designed to promote. And it is the definition of irrational. I see that my time has expired. I reserve my remaining time for rebuttal. Thank you. And your analogy, counsel, you're looking at apples and oranges, but calling them both apples. Either way, you're not getting a fruit basket that you can compare meaningfully to the other alternatives you're looking at. You have things that is the same, it's erosion under either circumstances. So it has to be compared the same way. So to call it this case, I thought in this case, your position was that the public got a lemon. That's fair to say, this is our deal either way. All right. Mr. Grant. Good morning, and may it please the court. Eric Grant for the U.S. Army Court of Engineers. I intend to use 16 minutes of Appley's time and give the remainder to counsel for the town of Ocean Isle Beach. I certainly want to jump into the different treatment that was the subject of Ms. Griffith's presentation. But first, I want to start with a couple of things that she said at the beginning, implying that this terminal groin is a disastrous environmental project that ignored the advice of expert agencies. That's just not the case. It's contradicted by the record. On page 1485 of the joint appendix, this terminal groin is described as leaky. It's created with loosely placed armor stone and that will allow sand and water to flow through the groin and allow the passage of fish larvae and sand. Then Ms. Griffith said that this groin will result in the long-term erosion of sand east of the groin. That's specifically contradicted by page 1680 of the joint appendix. The Corps' engineering report predicted that for the first year, there will be some erosion, but in years two and three, the area will stabilize and sand will actually be gained in that area. Then third, in terms of the expert wildlife agencies, I would direct the Corps to pages 2991 and following. That's the Army Corps' actual permit. It incorporates six construction conditions from the National Terms and Conditions from the U.S. Fish and Wildlife Service into the special conditions of the permit. Then, of course, the Corps also required at special conditions 34, 35, 53, and 54 required the project to comply with the North Carolina agency's inlet management plan. The advice of those agencies was in fact not ignored. It was followed. Jumping into the so-called different measurements, one is the different time frame. As to that, I guess I would start with what this court held in Webster, the USDA, that deciding what details need to be included or omitted from an environmental impact statement is generally a And so consequently, as the district court recognized, NEPA does not impose a requirement that the agency analyze impacts for any particular length of time. That's from page 72 of the joint appendix. The district court was quoting the Selkirk conservation case from the Ninth Circuit. And what's required, as Judge Niemeyer pointed out, is that the Corps explain why it did what it did. And the Corps did that here. And it explained in particular at page 1312 of the joint appendix that accurate future predictions for large-scale and long-term coastal changes are too difficult to make in the absence of necessary capabilities for those predictions. And conversely, on page 1406, that the three-year model simulation provided sufficient information on which to make engineering judgments. And, in fact, the Corps, speaking of apples to apples, on page 145 of the joint appendix, an internal court email said that it would potentially be misleading to do otherwise because it's hard, quote, to compare apples to apples considering our various alternatives have different nourishment intervals. And so the Corps did give a rational explanation. And going to the difference between the evaluation of economic costs and environmental effects, that, too, was rational and rationally explained. And, in particular, the modeling process, the so-called Delft 3D model, the Corps found that that accurately reflected erosion trends, but it systematically underestimated the absolute volume of erosion. And so the model required adjustment to more accurately estimate the absolute costs of beach re-nourishment and property loss. And the Corps forthrightly acknowledged that adjustment on page 1405 of the joint appendix. So the plaintiff, of course, criticizes the Corps for not making a similar adjustment as to environmental effects. But that decision was rational for two reasons. One, the economic cost of erosion is measured in large part in cubic yards of sand that must be replaced, and that's a measure of volume. But the environmental effect of erosion, that's a measure of area. See, for example, the chart on page 1407 of the joint appendix, which is reproduced at page 5 of plaintiff's reply brief. Real world data showed that the model underestimated lost sand volume and needed the adjustment that I mentioned. But no data indicated any problem with the estimate of lost habitat acreage. The second point is that the adjustment for lost habitat acreage, the lack of adjustment for that acreage, made no logical or legal difference. The crucial consideration for the environmental effect of a given alternative is not its absolute size, but its relative size. This is most obvious in the Clean Water Act's requirement that the selected alternative must be the least environmentally damaging practicable alternative. An alternative that is the least environmentally damaging will have that character even if all of the numbers are multiplied by four, which is what plaintiff seems to want here. Similarly, if the projected difference in harm for each alternative is modest, and plaintiff concedes that on page 5 of its reply brief, then that difference will remain modest even if all of the numbers are quadrupled. And so looked at both from the perspective of the time horizon and the adjustment for the different types of analyses, the the public sufficiently. And that's all that's required under the... I didn't want to cut you off while you're doing the two, but can you go back and just help me understand how the volume of sand doesn't translate to acreage? I mean, I'm not a marine expert by any stretch of the imagination, but if you if you tell me, I get your second point, right? But the first point, if you're removing more sand and we're talking about an island, I'm having a little trouble understanding how a greater volume, you know, four times as much sand volume doesn't mean that there wouldn't be a similar reduction in acreage. Help me just put that piece together. Yes, your honor, an excellent question. And as I understand it, it's because the same sand or sand at the same acreage is being lost over and over again. And so it's a question that the modeling showed the rate at which the sand would be lost didn't match the real world observations. And so the Corps needed to make that adjustment. But in terms of where the sand is being lost, it's the same. It's the same place over and over again. So the sand could be lost slower or faster, and that would change the volume of sand and the cost of replacing it. But the acreage where the sand was being lost, as I understand the record, did not change. And so that aspect of the Corps' analysis did not need adjustment. And so. So let's say Grant, acreage doesn't take into account of debt, does it? No, your honor. That was a cheap way of explaining my answer, answering my question. And depth is important because the more sand that has to be dumped, the more damaging potentially to the environment. And that's one of the reasons that the Corps chose alternative five, the terminal groin, as the environmentally damaging alternative. Because especially in the first five years, that alternative required 500,000 cubic yards less sand replacement than planer's preferred alternative, namely alternative four. Mr. Grant, you think it's supported by the record that a groin terminal was absolutely required. Forget about where you placed it and how long it is. You think that that was, either way you slice it, it would have to be the jetty of it, the groin terminal to address the problems. You think that that's been under every scenario? Well, your honor, as we've discussed, the Clean Water Act requires the least environmentally damaging alternative among those that are practicable. And the Corps specifically looked at that beginning on page 2796 of the joint appendix and went through all five alternatives and came up with a bottom line conclusion on page 2805 that the terminal groin alternative is the least environmentally damaging. And I should point out that that conclusion made clear that that alternative must include adaptive management requirements and particularly those in the so-called inlet management plan. And the Corps made clear that if the groin doesn't work, it will be modified or even removed and moved at the town's expense. And I would point out, I think it's in condition 54, the Corps made sure that the town provided financial assurance that it could do that if, after doing all the required study and analyzing the data, that the Corps determined that it needed to be modified or removed. It would be done so at the town's expense. I know Judge Niemeyer mentioned the so-called per event beach nourishment cap of 408,000 cubic yards. And I guess I would say about that, it appears to be the kind of fly specking that this court condemned in a case also involving the National Audubon Society that time against the Department of the Coast. Obviously the volume of sand that can be dredged and dumped on a beach at any one time is not infinite. And so the Army Corps chose per event cap in order to facilitate what it called an equitable comparison among the competing alternatives as to frequency. Again, we're trying to do apples to apples. And the cap was based on the Corps' three year budgetary That's at pages 1312 and 1320 of the joint appendix. And based on as plaintiff expressly concedes on historical averages and that concession is at page 26 of plaintiff's reply brief. And so we submit that that choice was within what the Supreme Court has called the bounds of reasoned decision making required by the APA. And I guess my second point in is that any error in this regard was harmless. If the Army Corps had rejiggered the cap as plaintiff desired, alternative four would not have required in later years more frequent nourishment than article five, than alternative five. But alternative four instead would have required 5% larger re-nourishment than alternative five at each interval. And page 26 of its reply brief. And as I pointed out before, it's undisputed that alternative four would require nearly 500,000 more cubic yards of fill in the first five years. And that's at pages 1324 and 1482 of the joint appendix. And so the use of that cap, like the other aspects of the Corps' decision, supported the Corps' bottom line conclusion that, quote, alternative four will result in increased environmental impacts and increased cost compared to alternative five, unquote. And that's at pages 2802 and 03 of the record. In this case, the town of Ocean Isle Beach and the U.S. Army Corps of Engineers proposed and thoroughly studied alternatives for responding to a very great long-term problem. They chose the least environmentally damaging alternative and reasonably explained that choice. That satisfied the Corps' obligation under both NEPA and the Clean Water Act. The district court's judgment so holding should be affirmed. Thank you. Unless the court has any other questions. Thank you, Mr. Grant. Mr. Ressler? Good morning, Your Honors. My name is Todd Ressler, and I represent the town of Ocean Isle Beach. The town's beaches at the eastern end of the island have eroded for years. Houses have been lost. The east end of First and Second Street are gone. Third Street is now oceanfront. Despite the town and beach continues to erode. If Audubon was in charge, it would have done things differently, but that's not the law. Agencies are entitled to select their own methodology as long as the methodology is reasonable. In this case, the Corps' methodology was reasonable. The Corps did not model two different shorelines. It was attempting to answer two very different questions. How much would it cost to implement each alternative over a 30-year period? And what are the benefits of each alternative that are bounded by the beach re-nourishment cycles? Beach re-nourishment is associated with each alternative. When determining costs over 30 years, these costs must be added up. Each beach re-nourishment event costs a certain amount, and you add those costs up over time. However, when evaluating indirect effects, each of these indirect effects is bounded by the re-nourishment cycle. I thought we would be talking about fruit during this case, but that's exactly what the Corps was trying to do. It was trying to compare apples to apples. The Corps disclosed the limitations of its models to predict habitat changes and environmental costs. It wasn't trying to predict these with absolute certainty. It was interested in the relative differences between each alternative. We're looking at environmental costs. The Corps had volume. Council, can I ask a question? Yes. Ms. Griffith indicated the re-nourishment was not occurring in alternative five. The beach re-nourishment was not occurring on the east end, on the east side of the jetty that you're talking about putting in. Does the record reflect, A, that that's true, they're not putting sand on the east end, and B, does it reflect anything about the impact of the re-nourishment on the east end over time? That's a good question, Your Honor. Council is correct that the eastern end of the island will not be re-nourished under any of the alternatives, the far eastern end. That has been tried. The undeveloped, sort of the undeveloped. Right. Yes. You have the islands developed, and then the last section of the island is undeveloped. That end of the sand has been put on the beach. It's been transported to the east, extending that area. The problem with re-nourishing that end of the island is that it's quickly lost into the channel, and so it's correct that that section of the island will not be re-nourished. But what Autobahn focuses on is the modeling results one year after the groin is constructed in one section of the beach, and Autobahn claims that it will be dramatically eroding. The record supports that following that initial equilibrium period, that section of the beach will actually gain sand. It's undisputed that it's consistent with the leaky, low-profile nature of the groin and the beach fillet that's put in between behind that groin. So the whole purpose of Alternative 5 is to not only protect houses and infrastructure, it also allows sand to be continued transported to that end of the island. If the analysis is wrong or if conditions change, there are enforceable mandatory mitigation measures that are in place. So in other words, really what the Corps was trying to do was compare apples to apples here, and it did that in every turn of the analysis. I see my time's up. I just want to make sure I understand, Mr. Ressler, you're saying in the sense that the jetty has almost a cure period, what you call equilibrium, where once it cures itself, then that east side of it, that shouldn't be a bait, the problem of the erosion that Councilor mentioned. That's correct, Your Honor. Each alternative has an equilibrium period, that when you put a natural system out of equilibrium by either placing sand on the beach or putting a structure in place, the natural environment will try to respond to that. And so there is a period of time that it's trying to reach that equilibrium, and that's what the model shows. The model shows that that section of the beach east of the groin will initially erode, but in years two and three after the groin is in place, that section of the beach will actually equilibrate or gain sand. All right, thank you. Ms. Griffith, you have time reserved to hear from you. Thank you, Your Honor. To start with a question from Judge Richardson, we're talking about sand here, and whether we're talking about it in cubic yards or acres, it's still the amount of sand that determines in both two and three dimensions what's underwater and what is exposed beach. And so if you have a situation where if you look at one section of the record, you're standing on the sand, and another second section of the record, and you're a foot underwater, there's nothing for people to understand or compare there. And there's no reasonable basis for the court to make its permitting decision. And so presenting the record like that and making a choice to use one set of numbers for environmental harms and another set of numbers for economic harms is an irrational decision, and the court's provided no justification. Which way are you saying that that's wrong? There are two possible ways. One, that it shouldn't, that the use of acreage is a problem, that when we talk about habitat, you shouldn't use acreage. Or are you saying that, in fact, the best way to anticipate acreage is sand volume, which is the problem you've got with that analysis? I don't think there's one way or another that it has to be done. I think one way that would have been fairly straightforward to do it and provide both fairness and transparency and the relative trends, which is all the courts as their model can do anyway, is to say, here are the environmental harms, here are the economic harms. We're showing you these to give a fair comparison, but we're concerned that they're understated. So that would have been one way to do it, but I don't think that's the only way. And to put this in context, the comparison of economic and environmental impacts here is just fundamentally on different footing. And I think it's not enough to say that the erosion would reach some sort of equilibrium or stabilize after a year, because this is a 30-year project, and that wasn't the reasoning for cutting short analysis. That's a post hoc rationale. What was the rationale was that we have these nourishment cycles every two to five years. But as counsel have agreed, that doesn't affect the relevant part of the island that we're worried about, and that the Fish and Wildlife Service said would essentially be destroyed if the terminal groin was built, and only if the terminal groin was built, not under the Edna consequences. I'm sorry, can I ask you a question? So do you disagree that, I mean, I thought the record did show, I don't know, there's 74,000, there's a loss in year one after the groin is built, but that in years two and three, that they will actually accrete or add sand. And so I guess I'm not, if that's true, what's the, it doesn't strike me that then you would need the beach renourishment on the east end, or at least that's a reasonable sort of conclusion to come to. Well, I think that is what the record says. But again, we only have those three years to look at. So it's unclear what that shows. And in other aspects, they did look at longer positions. So there's no reason it couldn't happen there. And I think the other thing is that it's not a question of whether you need beach renourishment on the east end or not, the harm is done. And I think that's one of the reasons that the proposal to would be unsuccessful. The harm is done there. And any harm beyond that, that we don't know about because it wasn't measured, is going to accumulate in addition to that and only make the harms worse. And we have not conceded that these harms are modest. The question is, when they are measured, are they barely capturing the harm and allowing it to be compared to the impacts there? And that didn't happen. And if the court had taken a hard look, this project could have been permitted. Thank you. Thank you. Thank you very much. Thank you, counsel, for your argument. We can't come down and greet you, but please know that our appreciation for your argument is nonetheless very heartfelt. And we thank you so much and wish you well. Be safe and stay well. Thank you, counsel.
judges: Roger L. Gregory, Paul V. Niemeyer, Julius N. Richardson